

# NUMBER 13-11-00321-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JUAN MANUEL SALAZAR,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

**On appeal from the 389th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Justices Benavides, Vela, and Perkes
Memorandum Opinion by Justice Rose Vela**

A jury convicted appellant, Juan Manuel Salazar, of murder, *see* TEX. PENAL CODE ANN. § 19.02(b) (West 2011), and assessed punishment at life imprisonment, plus a $10,000 fine. By three issues, appellant argues: (1) the trial court erred by admitting hearsay; (2) the trial court erred by admitting autopsy photos; and (3) he received ineffective assistance of counsel. We affirm.

## I. BACKGROUND

This case involves the brutal slaying of Jose "Joe" Fiscal, whose charred body was found at the Donna Lakes area in rural Hidalgo County, Texas. After he and his wife, Alma Fiscal, separated, she moved to Louisiana, and he moved in with his girlfriend, Guadalupe "Lupita" De Leon Acuna, who lived in Donna, Texas. Later, he decided to end their relationship, and in June 2010, he moved into a home in Weslaco, Texas. Lupita's daughter's boyfriend, Ezequiel Gamez, testified that on June 23 or 24, 2010, Lupita sent him a text message, stating "she wanted him dead." By "him," Gamez understood her to mean "Joe."

On July 1, 2010, Alma Fiscal returned from Louisiana and went to Joe's house. When she arrived, Lupita was inside Joe's house. Alma told Joe she wanted her out of the house, so he told Lupita to leave. The next day, Lupita sent Joe a text message that read, "Well, I see you're happy having two women. . . . You messed up big time." That same day, Lupita sent her son, Antonio "Tony" De Leon, a text message that stated, "Don't know what to do. It's like I want him six feet under. . . ."

Lupita's daughter, M.A., testified that about noon on July 3, 2010, Lupita left home with Joe. Afterwards, Tony and appellant left the house in Lupita's Expedition. Fifteen or twenty minutes later, appellant, Tony, and Lupita returned in the Expedition.

About noon that day, Aaron Garcia saw "a column of smoke" coming from the Donna Lakes area. He also saw "the tail of a vehicle" that was "coming out headed southbound" possibly from the area where he saw the smoke. When the prosecutor

2

showed him a photograph[1] of Lupita's Expedition and asked him, "[I]s it similar in size and color as the . . . [vehicle] that you saw leaving from the smoke?," he said, "Yes."

Troy McMillan arrived at Donna Lakes about midday on July 3, 2010. He saw a burning vehicle as well as a charred body laying near the burning vehicle. Investigators testified the burned vehicle belonged to Jose Fiscal and that a Texas identification card belonging to Jose Fiscal was found on the body.

Investigator Jonathan Palacios testified that on July 3, 2010 at 11:50 a.m., appellant sent Lupita a text message, stating "Try it, to take him over there." Fifteen minutes later, Lupita texted appellant saying, "On my way to the beach." Nine minutes later, appellant texted Lupita, saying, "We're on our way too."

Norma Farley, M.D., the forensic pathologist who performed Joe's autopsy, testified she saw thermal burns on his head, neck, torso, and extremities. He also had forty-five stab wounds, including stab wounds to the liver and lungs. In addition, he suffered blunt-force trauma to his head. When the prosecutor asked Dr. Farley if she had an opinion about the cause of death, she said, "Yes, . . . . I called it multiple stab wounds of torso with blunt force head trauma, . . . ." She ruled the death a homicide and said the stab wounds were consistent with the wounds a knife would produce.

Appellant testified that after he and his wife separated he began staying at Lupita's house. About 9:30 a.m. on July 3, 2010, Joe came to Lupita's house and picked her up. That day, at 12:30 or 12:45 p.m., appellant planned to visit his boys, who were living at 410 Jalapeno Street. Before he and Tony left in Lupita's Expedition, Tony put a gas can inside the vehicle. En route to Jalapeno Street, Tony asked him to pick up Lupita, who

---

[1] The trial court admitted this photo into evidence as State's exhibit 2.

3

was with Joe at Donna Lakes. When they arrived at Donna Lakes, appellant saw that Lupita and Joe were arguing. Tony grabbed a bat from inside the Expedition, and when Tony exited the vehicle, appellant saw a knife in his hand. Tony hit Joe with the bat four or five times on the head, nose, and back. Tony then began stabbing Joe. While Tony attacked Joe, Lupita told appellant to "help them." He refused and got into the Expedition's back seat. After Tony finished hitting and stabbing Joe, he gave appellant the knife and took the gas can and a lighter from the Expedition. Tony poured the flammable liquid onto Joe's body and inside his truck and then set both ablaze. When appellant, Lupita, and Tony returned to Lupita's house, appellant was still sitting in the backseat, "holding the knife and shocked." While still in the Expedition, appellant closed the knife, wrapped it in one of Tony's socks, and put the knife in a trash bag, which was in the vehicle. Afterwards, appellant took a shower. Later that day, he and Tony went to Relampago Lake where appellant threw the trash bag containing the knife into the lake. Appellant testified he threw the trash bag into the lake because he was trying to help Tony, who is his wife's nephew.

## II. DISCUSSION

### A. Admission of Hearsay Testimony

In issue one, appellant contends the trial court erred by admitting hearsay testimony.

#### 1. Standard of Review

"We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App.

4

2007). "Because trial courts are in the best position to decide questions of admissibility, appellate courts uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement." *Id.* "An appellate court may not reverse a trial court's decision regarding the admissibility of evidence solely because the appellate court disagrees with the decision." *Id.*

### 2. Background

During the State's case-in-chief, Tony's wife, Renee Mejia, testified that on July 3, 2010, she was in Tony's room when appellant came in and asked Tony to "leave with him." She stated Tony and appellant left in Lupita's Expedition. Later, Tony, appellant, and Lupita returned to the house. When the prosecutor asked Mejia, "At that time did you ask Tony if they had done something to Joe?," she said, "Yes." When the prosecutor asked her, "And what did Tony tell you?", defense counsel did not object to this question. Mejia replied, "Well, he just told me that he had seen something that Juan [appellant] had done." At that point, defense counsel stated, "Objection, Your Honor." When the trial court stated, "I don't know what your objection is," defense counsel said, "Objection, hearsay." The trial court overruled the objection.

### 3. Preservation of Error

"As a prerequisite to presenting a complaint on appeal, a party must have made a timely and specific request, objection, or motion to the trial court." *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1)(A)). Whether a defendant is required to object before a witness answers a question depends upon whether it called for a hearsay response. *See Rodriguez v. State*, 274 S.W.3d 760,

5

764 (Tex. App.—San Antonio 2008, no pet.). "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived." *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997).

Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d); *Baldree v. State*, 248 S.W.3d 224, 230–31 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Here, the prosecutor's question to Mejia—"And what did Tony tell you?"—called for a hearsay response. However, appellant did not object to the question; rather, he objected after she answered the question. Appellant has offered no reason, legitimate or otherwise, to justify delaying his objection until after Mejia responded, and we have found nothing in the record to justify the delay.

We note that after the trial court overruled the objection, the prosecutor asked Mejia, "Can you go ahead and answer that again, Renee, what is it that Tony told you?" To this, she said, "That Juan had done something." Defense counsel did not object to the question or the answer. "It is also necessary that the objecting party must continue to object each time the objectionable question or evidence is offered, obtain a running objection, or request a hearing outside the jury's presence in order to preserve a complaint for appellate review." *Grant*, 345 S.W.3d at 512; *see Martinez v. State*, 93 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999). In the instant case, defense counsel (1) did not renew his objection, (2) did not obtain a running objection, and (3) did not request a hearing outside the jury's

6

presence.   Thus, appellant failed to preserve this complaint for our review.   *See* TEX. R.

APP. P. 33.1(a).   Therefore, we hold the trial court did not abuse its discretion by

admitting the complained-of testimony.   Issue one is overruled.

## B. Admission of Autopsy Photographs

In issue two, appellant contends the trial court erred by admitting autopsy

photographs into evidence during the State's case-in-chief.

### 1. Background

During the State's direct-examination of Dr. Farley, the prosecutor offered into

evidence State's exhibits 90 through 137, which are autopsy photographs depicting the

numerous wounds to the victim's body.   Defense counsel objected to State's exhibits 90

through 127 under Texas Rule of Evidence 403 and stated "that the probative value is

substantially outweighed by the danger of unfair prejudice. . . ."   The trial court overruled

the objection.   Next, defense counsel objected to State's exhibits 128 through 137 "under

the same reason . . . [and] the autopsy photographs . . . depict mutilation of the victim

caused by the autopsy. . . ."   Before the trial court ruled on the objections to State's

exhibits 128 through 137, the prosecutor asked Dr. Farley the following:

> Q.     Dr. Farley, will those photographs [State's exhibits 128 through 137]
> assist you in explaining to the jury the injuries that were inflicted on
> the body of Jose Fiscal and the injuries that you observed while
> performing your autopsy?
>
> A.     Yes.   I mean, they'll help visualize what I observed.
>
> Q.     Do they show injuries that you could not otherwise see by just
> looking at the outside of the body?
>
> A.     Well, yes.

7

At that point, the trial court asked Dr. Farley:

Q.     The injuries that are depicted in these photographs, did you do these injuries?   Or are these the injuries that . . . we are viewing that you will be describing?"

A.     They're injuries that were already there that I'm going to be describing.   They're not me.   I didn't do them.

Afterwards, the trial court overruled the objections to State's exhibits 128 through 137.  State's exhibits (SX) 90 through 137 show the following:   SX 90 shows burns to the victim's buttocks and lower extremities; SX 91 shows charring and burns to the inner thighs and lower calves; SX 92 shows burning and charring to the face and neck; SX 93 shows burns to the left hand and fingers; SX 94 shows the palm of the victim's hand; SX 95 shows a stab wound to the lower right face; SX 96 and SX 97 show a stab wound above the clavicle; SX 98, 99, and 100 show stab wounds to the chest; SX 101, 102, and 103 show stab wounds to the abdomen; SX 104 shows a stab wound to the pelvis; SX 105 shows a stab wound to the left side; SX 106 and 107 show stab wounds to the chest; SX 108 shows a stab wound to the head; SX 109 through 115 show stab wounds to the back; SX 116 shows a stab wound to the abdomen; SX 117 shows a stab wound to the right lung; SX 118 shows a stab wound to the right buttock; SX 119 shows a stab wound to the chest; SX 120 shows a stab wound to the back of the left arm; SX 121 shows a stab wound to the left hand; SX 122 shows a contusion to the lower lip; SX 123 shows an abrasion to the forehead; SX 124 shows trauma to the nose; SX 125 is a photo showing burns to the victim's cowboy boots; SX 126 is a photo of the victim's shirt, showing the marks left by the stab wounds; SX 127 is a photo of the victim's pants showing burn marks; SX 128 shows the top of the victim's skull, revealing a small fracture; SX 129

shows part of the trachea and larynx, showing no soot in the airway;[2] SX 130 shows where the stab wounds entered the chest; SX 131 shows all of the stab wounds that are coming into the body along the right side; SX 132 shows a contusion to the left frontal lobe of the brain; SX 133 shows four penetrating wounds to the right lung; SX 134 shows wounds to the back; SX 135 shows the scalp with a contusion; SX 136 shows a subarachnoid hemorrhage to the brain; and SX 137 shows "one wound going through the mesentery right next to the bowel."

### 2. Standard of Review

In order for photographs to be admissible, they must first be relevant. *Garza v. State*, 963 S.W.2d 926, 928 (Tex. App.—San Antonio 1998, no pet.). "Generally, a photograph is admissible if verbal testimony as to matters depicted in the photograph is also admissible." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) (citing *Long v. State*, 823 S.W.2d 259, 271–72 (Tex. Crim. App. 1991)). "In other words, if verbal testimony is relevant, photographs of the same are also relevant." *Id.* "Texas Rule of Evidence 401 defines relevant evidence as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* "Evidence must satisfy two requirements to be considered relevant: first, materiality, and second, probativeness." *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001). "For evidence to be material it 'must be shown to be addressed to the proof of a material

---

[2] When the prosecutor asked Dr. Farley "[W]hat is that indicative of?," she testified this "usually means that the individual is dead at the time of the fire because when things burn you know that you see black smoke. When you inhale that smoke, it ends up not only bringing some of that soot into the airway but also causing thermal injuries to the airway itself in the mucosa or the lining surface will start to slough off."

proposition, i.e., 'any fact that is of consequence to the determination of the action.' 'If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial.'" *Id.* (quoting STEVEN GOODE ET AL., TEXAS PRACTICE GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 401.1 (2d ed. 1993 & Supp. 1995)). "If the proponent establishes that the proffered evidence is material, Rule 401 also requires that the proponent establish that the evidence is probative, i.e., the proffered evidence must tend to make the existence of the fact more or less probable than it would be without the evidence." *Id.* (internal quotations omitted). "The proffered evidence is relevant if it has been shown to be material to a fact in issue and if it makes that fact more probable than it would be without the evidence." *Id.*

### 3. Analysis

The State had to prove appellant murdered Jose Fiscal. Dr. Farley described the types of injuries Fiscal received, the extent of those injuries, and the cause of his death. Thus, her testimony was material because it helped to prove a proposition that was a matter at issue. Her testimony was probative because it tended to make the existence of a fact, the scope and extent of the injuries and the cause of death, more probable than it would have been without the testimony. Because her testimony was relevant, the photographs are relevant as well. *See* TEX. R. EVID. 401; *Gallo*, 239 S.W.3d at 762 (stating, "if verbal testimony is relevant, photographs of the same are also relevant").

In determining whether a trial court "erred in admitting relevant photographs into evidence, our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009) (citing TEX. R. EVID. 403). "The trial court's decision is reviewed under an abuse of discretion standard, and may be disturbed on appeal only when the trial court's decision falls outside the zone of reasonable disagreement." *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo*, 239 S.W.3d at 762. A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered; their gruesomeness; their detail; their size; whether they are in color or black-and-white; whether they are close up; whether the body depicted is clothed or naked; the availability of other means of proof; and other circumstances unique to the individual case. *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010) (citing *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997); *Long v. State*, 823 S.W.2d 259, 277 (Tex. Crim. App. 1991)).

In the instant case, the admission of the photographs did not cause undue delay in the trial, especially when considering the time the State spent in presenting other evidence to the jury. In addition, the photographs were not cumulative of other evidence, including Dr. Farley's testimony about what each photograph depicted. *See Gallo*, 239 S.W.3d at 762 (stating, "A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination. The fact that the jury also heard

11

testimony regarding the injuries depicted does not reduce the relevance of the visual depiction."). In this case, the photographs show the detail of the injuries inflicted upon the victim. The photographs are four and one-half by six and one-half inches in size. Many of them appear to have been taken from about three to four feet away from the target. The body is not naked. Some of the photographs are gruesome, but they portray no more than the gruesomeness of the injuries inflicted. And, the record does not show the State introduced them into evidence in order to inflame the jury. Because Dr. Farley testified about what each photograph depicted, there was no danger the jury would be misled into thinking appellant was responsible for the removal of the scalp, the skull cap, and the exposing of the brain and other organs. Furthermore, the photographs were highly probative to show the full extent of the injuries appellant inflicted on the victim. *See Gallo*, 239 S.W.3d at 763.[3] We conclude that the probative value of the autopsy photos was not substantially outweighed by the danger that they unfairly prejudiced appellant. Therefore, we hold the trial court did not abuse its discretion by admitting the photographs into evidence. Issue two is overruled.

**C. Ineffective Assistance of Counsel**

---

[3] In *Gallo*, the trial court admitted into evidence autopsy photographs marked as State's exhibits 91-99, three and one-half inch by five-inch color photographs, showing "injuries discovered during the internal examination of the victim's body." *Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007). The court noted that exhibits 91 and 92 are close-up views of the victim's cracked ribs and that in exhibit 91, the rib had been removed from the body. *Id* Exhibits 93-99 showed various views of the underside of the victim's scalp, the victim's skull, and one picture of the victim's brain. *Id.* The court of criminal appeals noted that "[t]he medical examiner used the photographs to show the massive amount of damage that was inflicted on the victim before her death, including a twelve-inch fracture that began at the base of her skull where the bone is thick." *Id.* The court also noted that the medical examiner "used the photographs to show the injuries that could not be seen on the surface of the body." *Id.* The court stated that "[a]though these photographs are gruesome, there was no danger that the jury would attribute the removal of the rib, scalp, or skull cap to the defendant. Furthermore, the photographs were highly probative to show the full extent of the injuries appellant inflicted on the victim." *Id.* The court held that under the circumstances of this case, the trial court did not abuse its discretion in deciding that the probative value of the photographs substantially outweighed the danger of unfair prejudice. *Id.*

In issue three, appellant complains of ineffective assistance of counsel.

## 1. Standard of Review

"The Sixth Amendment to the United States Constitution, and section ten of Article 1 of the Texas Constitution, guarantee individuals the right to assistance of counsel in a criminal prosecution." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10). "The right to counsel requires more than the presence of a lawyer; it necessarily requires the right to effective assistance." *Id.* (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). "However, the right does not provide a right to errorless counsel,[4] but rather to objectively reasonable representation." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

"To prevail on a claim of ineffective assistance of counsel, an appellant must meet the two-pronged test established by the U.S. Supreme Court in *Strickland*. . . ." *Id.* "Appellant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 689). "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Id.* (citing *Strickland*, 466 U.S. at 687). "In order to satisfy the first prong, appellant must prove, by a preponderance of the evidence, that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms." *Id.* "To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would

---

[4] *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

have been different." *Id.* (citing *Strickland*, 466 U.S. at 687).

"An appellate court must make a 'strong presumption that counsel's performance fell within the wide range of reasonably professional assistance.'" *Id.* (quoting *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006) (citing *Strickland*, 466 U.S. at 689)). "In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Id.* (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "'It is not sufficient that appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence.'" *Id.* at 142–43 (quoting *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007)). "When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Id.* at 143 (citing *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "In making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of each case without the benefit of hindsight." *Id.* (citing *Robertson*, 187 S.W.3d at 483).

The court of criminal appeals "has repeatedly stated that claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Id.* (citing *Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex. Crim. App. 2002); *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)); *see Ex parte Nailor*, 149 S.W.3d 125, 131 (Tex. Crim. App. 2004). "On direct appeal, the record is usually inadequately developed

14

and 'cannot adequately reflect the failings of trial counsel' for an appellate court 'to fairly evaluate the merits of such a serious allegation.'" *Id.* (quoting *Bone*, 77 S.W.3d at 833).

### 2. Analysis

### a. Cross-Examination of Investigator Jonathan Palacios

During the State's case-in-chief, defense counsel cross-examined Investigator Jonathan Palacios about Lupita providing a statement to investigators. Investigator Palacios testified Lupita provided her statement on July 3, 2010, the day of the murder. When defense counsel asked him, "Can you tell this jury what were you able to find out after your initial visit with Lupita?," he referred to her statement and said Lupita "says that she makes contact with the victim and they convey text messages to each other." He stated that three days later, "[w]e obtained text messages" and "[b]ased on physical evidence she [Lupita] became a person of interest" in Joe's murder. He also testified Lupita gave "multiple statements." When defense counsel asked him, "[D]id . . . the statements taken from Lupita, . . . change at all?," he answered affirmatively and said they changed because "[t]here was more information that she wished to add than what she originally had provided." When defense counsel asked what information was added, Investigator Palacios said he did not know, and defense counsel told him to "go . . . to [Lupita's] . . . third statement." Without objection, Investigator Palacios testified as follows:

> Assisting Investigators L. Garcia and F. Tanguma, proceeded to question Guadalupe Lupita De Leon Acuna. Guadalupe Lupita De Leon Acuna was provided with Miranda warnings and provided a voluntary statement of accused. Guadalupe Lupita De Leon Acuna went on to say that she has a boyfriend named Jose Guadalupe Fiscal.

15

* * *

Okay. They have known each other for almost two years. They do not have any children together. Jose had been separated from his wife for about three years. She and Jose lived together for about 18 months. She said Jose bought a new house located at 2506 Blue Jay in Weslaco, Texas. Because he got his children for the summer, she and Jose would take turns staying at each other's houses with the children.

Jose would have many problems with his wife, Alma Delia Fiscal. Jose would tell her that Alma would always complain about the child support. On Saturday July 3rd, 2010 she was at home when Jose texted her. He told her he was going over to the house. Most of the morning she waited for Jose, but never showed up. Jose finally arrived at the house at or about 11:00 a.m. She asked Jose if he would take her to the bank to cash her paycheck.

She and Jose left her house in his red Dodge Dakota truck. Jose took her to the Frost Bank on Salinas Street in Donna, Texas. After she cashed her check, Jose took her to a drive-through convenience store near the bank. Jose mentioned to her that he was going to work at a clinic in McAllen, Texas. She told Jose to take her back home. Said they drove to her house and dropped her off.

About 16 minutes later Jose called her on her cell phone and told her to meet him outside of her house. She walked outside and Jose was waiting for her in his red truck. She walked over to Jose and he told her to get inside his truck. She got inside his truck and he drove away. . . . She left with him and they went for a cruise.

After Investigator Palacios stated this, defense counsel asked him, "Through your investigation did you find out if Tony had a cut on his right finger?" He answered, "Yes," and stated that when Tony "was brought into the office the second time, he was questioned and in his statement he says that while stabbing the victim he cut himself."

Appellant argues he was denied effective assistance of counsel because his trial attorney elicited testimony from Investigator Palacios that Tony admitted to cutting his finger while stabbing the victim and because counsel elicited "a portion of Lupita's

16

statement." The defensive theory in this case was that even though appellant was present during Joe's murder, he did not participate in it. Investigator Palacios's testimony showed that Tony, and not appellant, stabbed the victim, and the aforementioned portion of Lupita's statement showed she had a relationship with Joe and that she alone was with Joe just prior to his murder. Thus, defense counsel's elicitation of this evidence is an apparent attempt to place the blame for the murder on Lupita and Tony. When, as in this case, "counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State*, 93 S.W.3d 79, 88-89 (Tex. Crim. App. 2002).

**b. Redirect-Examination of Investigator Jonathan Palacios**

On redirect-examination, the prosecutor asked Investigator Palacios to finish reading the statement made by Lupita. Without objection, he testified, in relevant part, that Lupita stated:

> Jose [Fiscal] called her [Lupita] on her cell phone and told her to meet him outside of her house. . . . She walked over to Jose and he told her to get inside his truck. She got inside his truck and he drove away.
>
> * * *
>
> Jose stopped with his truck and he told her [Lupita] to get off the truck. She and Jose sat down on the rocks near the lake. She was talking to Jose when she received a text message from Juan or Tony. Juan Manual Salazar [appellant] is married to her [Lupita's] sister, Catalina, and Antonio De Leon is her [Lupita's] son. . . . She texted back and told them that she was at the beach, slash, lake. She knows that Juan and Tony know the place that she was talking about. She and Jose continued talking.

17

Several minutes later she noticed her beige Ford Expedition driving up to them. She noticed that it was her son and her brother-in-law Juan Salazar. She saw both of them get off of the truck and Juan struck Jose on the head once with a wooden stick. Antonio and Juan began to fight with Jose. . . .

She noticed her son Antonio had handed over a knife to Juan. She noticed Juan began to stab Jose on the body and Juan then passed the knife to her son who then stabbed Jose several times in the body. . . . Juan then . . . told her to get inside the truck. She was going to her truck when she heard Juan tell her son to get him a lighter. . . .

She was able to see Juan and Antonio fighting with Jose on the ground. She placed her truck in reverse and faced it south. At the same time that she was moving her truck she noticed that flames were coming out of Jose's truck. She was not able to see what else was happening. Her son and Juan got in her truck and Juan told her to drive away fast. She drove south on Valley View Road and Juan told her to drive to her house. . . .

Appellant argues defense counsel was ineffective because he let the prosecutor elicit testimony showing appellant "had actually stabbed, hit, or acted in any assaultive manner against the victim." He contends defense counsel should have objected that the testimony is hearsay and that he was denied the right to confront the witness. Before an appellate "court may conclude counsel was ineffective for failing to make an objection, appellant must show the trial court would have erred in overruling the objection." *Jagaroo v. State*, 180 S.W.3d 793, 801 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

"Hearsay is 'a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011) (quoting TEX. R. EVID. 801(d)). "Generally, hearsay statements are not admissible unless the statement falls within a recognized exception to the hearsay rule." *Id.* Texas Rule of Evidence 107, known as

the rule of optional completeness, is a recognized exception. *Id.* The rule states:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.

TEX. R. EVID. 107. "This evidentiary rule 'is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing.'" *Id.* (quoting *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007)). "Rule 107 is not invoked by the mere reference to a document, statement, or act. Rather, to be admitted under that rule, 'the omitted portion of the statement must be on the same subject and must be necessary to make it fully understood.'" *Id.* (quoting *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004)).

In the instant case, the jury heard the first portion of Lupita's statement, which described what happened between Joe and Lupita on the day of, but prior to, his murder. On redirect-examination, the prosecutor asked Investigator Palacios to read the rest of Lupita's statement, which described the events surrounding Joe's murder. The testimony about the events surrounding Joe's murder came from the same document and the same subject as the testimony used by defense counsel. Defense counsel's cross-examination of Investigator Palacios could have left a false impression on the jury that appellant was not present when Joe was murdered. Accordingly, the declarations in the second portion of Lupita's statement, relating to the roles she, appellant, and Tony played in the murder were admissible under the rule of optional completeness. Thus, an objection would not have been successful, and we cannot conclude counsel was

19

ineffective for failing to make an objection where appellant has failed to show the trial court would have erred in overruling the objection. *See Jagaroo*, 180 S.W.3d at 801 (stating trial counsel's failure to object did not amount to ineffective assistance of counsel when objection would have been futile).

Even assuming defense counsel's performance was deficient, appellant has failed to satisfy Strickland's second prong. Appellant testified that at Tony's request, he drove to Donna Lakes. There, Tony attacked and killed Joe. Even though appellant stated he did not help Lupita or Tony kill Joe, he testified that after Tony stabbed Joe, Tony gave him the knife used to commit the murder. Appellant held onto the knife, and when he, Tony, and Lupita returned to Lupita's house, appellant closed the knife, wrapped it in Tony's sock, put the knife in a trash bag, and went with Tony to dispose of the knife. In addition, Gamez testified that after 12:00 noon on July 3, 2010, appellant, Tony, and Lupita returned to Lupita's house in her Expedition. After they arrived, appellant asked him to clean the interior of the Expedition. While Gamez cleaned the interior, he saw two drops of blood. When he asked appellant where the blood came from, he said Tony cut himself. An attempt to conceal incriminating evidence is probative of wrongful conduct and is also a circumstance of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see Bryan v. State*, 990 S.W.2d 924, 928 (Tex. App.—Beaumont 1999, no pet.) (stating that tampering with evidence evidences a consciousness of guilt).

Furthermore, Gamez testified that in the morning of July 3, 2010, he heard Tony ask appellant "about the gun, and [appellant] just said that he couldn't get it, but that they would just use a knife." M.A. testified that before appellant left Lupita's house on the day

of the murder, "[H]e went into my brother's [Tony's] room and told him to go with him. Then he told my brother to get the gasoline that was next to the door and go put it in the truck." She saw her brother grab a can of gas and put it into Lupita's Expedition.

Based upon the evidence, a jury could have reasonably concluded appellant was a participant in Joe's murder and that he knew he was assisting in the offense. The charge included an instruction on the law of parties. Accordingly, appellant has failed to show there is a reasonable probability that but for counsel's alleged errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687–88. We hold, therefore, appellant was not denied his right to the effective assistance of counsel. Issue three is overruled.

## III. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
21st day of June, 2012.